IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DYLAN ERIC LANDERS,<br><br>          Plaintiff,<br><br>vs.<br><br>SCOTT FRAKES, DIANE SABATKA-RINE, J. BEATY, Research Representative; C. CONNELLY, Intelligence Representative; M. ROTHWELL, Classification Representative; and S. BRYANT, PsyD, Mental Health Representative;<br><br>          Defendants. | **8:17CV371**<br><br><br>**MEMORANDUM<br>AND ORDER** |

This matter is before the court on Defendants' Motion for Summary Judgment. (Filing No. 63.) For the reasons that follow, the Motion is granted on Plaintiff's federal claims and denied with respect to Plaintiff's state law claims. The state law claims will be dismissed without prejudice pursuant to the court's discretionary authority under 28 U.S.C. § 1367(c)(3).

## I. BACKGROUND

Plaintiff, a prisoner currently confined at the Nebraska State Penitentiary ("NSP"), filed this action seeking monetary, injunctive, and declaratory relief pursuant to 42 U.S.C. § 1983 against Defendants Scott Frakes, Director of the Nebraska Department of Correctional Services ("NDCS"); Diane Sabatka-Rine, Deputy Director of Operations of NDCS; and members of the Central Office Multi-Disciplinary Review Team (hereinafter "Review Team members")[1]: J. Beaty,

---

[1] Plaintiff also identified Frakes and Sabatka-Rine as Review Team members. (Filing No. 24 at CM/ECF p. 1.)

Research Representative; C. Connelly, Intelligence Representative; M. Rothwell, Classification Representative; and S. Bryant, PsyD, Mental Health Representative. (Filing No. 1; Filing No. 24; Filing No. 28.)[2] Plaintiff sued Defendants in their official and individual capacities.[3]

Plaintiff alleges that he has been confined repeatedly in segregation under conditions that violate his rights to due process and to be free from cruel and unusual punishment under the Fifth, Eighth, and Fourteenth Amendments. (Filing No. 1; Filing No. 28.) He alleges that the individual Defendants have been involved in the decisions and review processes concerning Plaintiff's prolonged confinement in segregation. (Filing No. 1; Filing No. 28.) Plaintiff also claims that Defendants' actions violated various state statutes. (Filing No. 1; Filing No. 28.)

As relief, Plaintiff seeks an injunction requiring Frakes and Sabatka-Rine to: (1) release him from segregation and place him in General Population; (2) cease all placements of Plaintiff in any form of "alternative housing" more restrictive than General Population; and (3) cease all restrictions that deprive Plaintiff of privileges which he has not specifically abused "as stated in L.B. 598." (Filing No. 1 at CM/ECF p. 25.) Additionally, Plaintiff seeks an injunction against the members of the Review Team to cease "being 'rubber stamps' and approving segregational classifications when little or no factual evidence exists." (Filing No. 1 at CM/ECF

---

[2] Plaintiff filed a supplement (filing no. 28) to the Complaint (filing no. 1) which amended the "Relief Requested" section of the Complaint (filing no. 1) to include compensatory and punitive damages and added two sections entitled "Liberty interests, Atypical and Significant hardship claims" and "Documented Evidence," the latter of which includes several attached documents. The court treated the supplement (filing no. 28) and the Complaint (filing no. 1) as an amended complaint. (Filing No. 35.)

[3] After an initial review of the Complaint (filing no. 1), the court dismissed (1) NDCS from this action and (2) Plaintiff's claims for declaratory relief for alleged past violations of federal law against Defendants in their official capacities. (Filing No. 16 at CM/ECF pp. 6-7, 12.)

p. 27.) Plaintiff also asks the court to declare that his segregation under the conditions alleged and the "sham reviews" provided him violate his rights under the 5th, 8th, and 14th Amendments and that Frakes "has attempted to harm Plaintiff by holding him in prolonged segregation after acknowledging the harmful affects [sic] and very counterproductive results of it to local news outlets." (Filing No. 1 at CM/ECF p. 26.) Finally, Plaintiff seeks compensatory and punitive damages. (Filing No. 28 at CM/ECF pp. 1-2.)

Defendants filed their Motion for Summary Judgment (filing no. 63) on November 5, 2018. In support of their Motion, Defendants filed a Brief (filing no. 64) and an Index of Exhibits (filing no. 65).[4] Plaintiff filed a "Statement of Facts in Opposition to Defendants' Summary Judgment" (filing no. 74) and an "Affidavit and Declaration in Opposition to Defendants' Motion for Summary Judgment" (filing no. 75). Defendants did not file a reply. The matter is fully submitted and ready for disposition.[5]

---

[4] The court permitted Defendants to file Exhibit 4 (filing no. 65-4) and Exhibit 5 (filing no. 65-5) under seal because they contain confidential and sensitive information. (Filing No. 62.) The information in the sealed exhibits did not impact the court's decision on Defendants' Motion for Summary Judgment.

[5] On February 14, 2019, Plaintiff filed a Motion to Include Evidence. (Filing No. 81.) The motion is largely repetitive of Plaintiff's earlier allegations and arguments and does not include any supporting documentation. In addition, he did not swear to any of the statements in the motion, and it was filed after the deadline had passed for Defendants to file a reply brief and after the summary judgment matter had been submitted. Therefore, the court will deny Plaintiff's Motion to Include Evidence (filing no. 81).

## II.  RELEVANT UNDISPUTED MATERIAL FACTS[6]
## Overview of NDCS Restrictive Housing

1.     Restrictive housing within the NDCS is for individuals who demonstrate high risk behavior during their incarceration which requires them to be separated from the general population for the safety of the inmate, others, and the security of the institution. Restrictive housing serves a legitimate purpose when utilized appropriately for risk assessment and mitigation with the goal of returning individuals to less restrictive settings as soon as it is safe to do so. (Filing No. 65-8 at CM/ECF p. 3.)

2.     Restrictive housing shall be used in the least restrictive manner possible, consistent with institutional safety and security. When restrictive housing is used, the purpose shall be two-fold: short-term risk assessment and longer-term risk/needs intervention. Short-term restrictive housing, or Immediate Segregation,

---

[6] Plaintiff, a pro se litigant, is "bound by and must comply with all local and federal procedural rules." NEGenR 1.3(g). The court's local rules require the party moving for summary judgment to file a brief containing a "separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." This statement of facts "should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to . . . materials that support the material facts . . . ." NECivR 56.1(a). The opposing party must respond to the moving party's statement of material facts in a brief containing separate numbered paragraphs with citations to supporting references and with identification of material facts that are disputed. NECivR 56.1(b). *See also* NECivR 7.1(b)(2)(A) ("When filing the opposing brief, the opposing party must also file and serve supporting evidentiary material not previously filed."). Properly referenced material facts in the movant's statement of facts are "considered admitted unless controverted in the opposing party's response." NECivR 56.1(b)(1). The material facts below, largely taken from Defendants' brief and appearing in numbered paragraphs, are those that have not been properly disputed pursuant to the court's local rules. Plaintiff opposes some of the material facts set forth by Defendants but mostly through his own allegations of denial, legal conclusions, and argument, rather than through evidentiary support.

provides time to assess the risk the individual poses to safety and security. The guiding focus of Longer-Term Restrictive Housing ("LTRH") shall be on individualized goal planning, behavior change, and treatment that will facilitate the inmate's capacity to live successfully in general population and return successfully to the community. (Filing No. 65-2 at CM/ECF p. 5, Section II.A (NDCS Administrative Regulation, Restrictive Housing, No. 210.01 (effective July 1, 2016, last revised June 30, 2017)).)

3.     Immediate Segregation is a short-term restrictive housing assignment of not more than thirty days in response to behavior that creates a risk to the inmate, others, or the security of the institution. Immediate Segregation is used to maintain safety and security while investigations are completed, risk and needs assessments are conducted, and appropriate housing is identified. (Filing No. 65-2 at CM/ECF p. 2.)

4.     As of July 2016, incidents that could result in placement on Immediate Segregation status are limited to the following:

    1.    A serious act of violent behavior (i.e., assaults or attempted assaults) directed at correctional staff and/or at other inmates.

    2.    A recent escape or attempted escape from secure custody.

    3.    Threats or actions of violence that are likely to destabilize the institutional environment to such a degree that the order and security of the facility is significantly threatened.

    4.    Active membership in a "security threat group" (prison gang), accompanied by a finding, based on specific and reliable information, that the inmate either has engaged in dangerous or threatening behavior directed by the security threat group or directs the dangerous or threatening behavior of others.

5.     The incitement or threats to incite group disturbances in a correctional facility.

6.     Inmates whose presence in the general population would create a significant risk of physical harm to staff, themselves and/or other inmates (a WRITTEN EXPLANATION OF THE EVENT AND DECISION MUST BE INCLUDED).

([Filing No. 65-2 at CM/ECF pp. 5-6](#), Section III.B.)[7]

5.     Administrative Confinement was a prior form of restrictive housing in which an inmate was removed from general population for an indefinite period of time to maintain order and security within the institution. It was not a form of disciplinary segregation. ([Filing No. 65-1 at CM/ECF p. 2](#), ¶ 9 (Affidavit of Sabatka-Rine); [Filing No. 65-3 at CM/ECF p. 2](#), Section II.E.1 (NDCS Administrative Regulation, Inmate Classification and Assignment-Special Management Inmates, No. 201.05 (effective March 1, 1980, last revised July 31, 2015)).)

6.     Legislative Bill 598 ("LB 598") was proposed by the Nebraska Legislature during the 2015 session. LB 598, which became effective on August 30, 2015, established the least restrictive environment standard for restrictive housing. ([Filing No. 65-1 at CM/ECF p. 3](#), ¶ 10; [Filing No. 65-8 at CM/ECF p. 2](#) (NDCS 2017 Restrictive Housing Annual Report).)

7.     As required by LB 598, NDCS formally promulgated its restrictive housing rules and regulations, effective July 1, 2016, to establish the least restrictive environment standard for all restrictive housing placements. This standard requires that inmates in restrictive housing be housed in the least restrictive environment

---

[7] Before July 2016, the reasons for Immediate Segregation included, but were not limited to: a pending investigation regarding a criminal act, a pending classification hearing, and the safety and security of the institution. ([Filing No. 65-3 at CM/ECF p. 3](#), Section III.B (NDCS Administrative Regulation, Inmate Classification and Assignment-Special Management Inmates, No. 201.05 (effective March 1, 1980, last revised July 31, 2015)).)

compatible with the safety of the inmate, others, and institutional security. (Filing No. 65-1 at CM/ECF p. 3, ¶ 11; Filing No. 65-8 at CM/ECF pp. 2-4.)

8. The restrictive housing reforms implemented within NDCS since 2015 have fundamentally changed the way restrictive housing operates. The focus today is on using restrictive housing to manage risk and not as punishment. (Filing No. 65-8 at CM/ECF p. 3.)

9. After July 1, 2016, there are two categories of restrictive housing within NDCS:

    a. Immediate Segregation (IS) - A short-term restrictive housing assignment of not more than 30 days in response to behavior that creates a risk to the inmate, others, or the security of the institution. IS is used to maintain safety and security while investigations are completed, risk and needs assessments are conducted, and/or appropriate housing is identified.

    b. Longer-Term Restrictive Housing (LTRH) - A classification-based restrictive housing assignment of more than 30 days. LTRH is used as a behavior management intervention for inmates whose behavior continues to pose a risk to the safety of themselves or others and includes inmate participation in the development of a plan for transition back to general population or mission specific housing.

(Filing No. 65-1 at CM/ECF p. 4, ¶ 12; Filing No. 65-7 at CM/ECF p. 4 (NDCS 2018 Restrictive Housing Annual Report); Filing No. 65-8 at CM/ECF p. 4.)

## Overview of Longer-Term Restrictive Housing ("LTRH")

10. LTRH is used as a behavior management intervention for inmates whose behavior continues to pose a risk to the safety of themselves or others and includes inmate participation in the development of a plan for transition back to general population or mission-specific housing. (Filing No. 65-2 at CM/ECF p. 3.)

11.    LTRH shall be used when inmates need more intensive supervision and intervention before promotion to an appropriate non-restrictive housing assignment. LTRH is a targeted individualized intervention with a primary emphasis on pro-social behavior, interactions with others, life-view change, incentives for positive change, and successful transition to lower levels of security. Consideration at all levels of review must be given to the mental health needs of the individual. (Filing No. 65-2 at CM/ECF p. 8, Section IV.A.)

12.    When it comes to risk assessment and management, there is no standard length of time that can be set to fully address an inmate's needs and mitigate the risk an inmate poses to the safety of himself/herself or others. (Filing No. 65-7 at CM/ECF p. 16.)

13.    Each inmate in LTRH has a Behavior/ Programming Plan that shall be reviewed during scheduled Restrictive Housing Status reviews. The Behavior/Programming Plan outlines to staff and inmates the steps and criteria for inmates to return to the general population or transition to another form of non-restrictive housing. It includes an incentive-based system that encourages pro-social behavior and program engagement. (Filing No. 65-2 at CM/ECF p. 12, Section V.)

14.    Mental health services for LTRH inmates "shall be managed through a combination of requests for consultation made by the inmate or facility staff (in accordance with established procedures and protocols), and weekly cell-front visits by mental health providers." (Filing No. 65-2 at CM/ECF p. 12, Section VI.A.)

15.    As of July 1, 2016, NDCS no longer places individuals in restrictive housing for disciplinary purposes but uses it to assess and mitigate the risk of those inmates who pose a significant threat to the safety of themselves, other individuals, or NDCS staff members. (Filing No. 65-7 at CM/ECF p. 4.)

16.    Inmates "are placed in restrictive housing in response to behavior that creates a risk to the inmate, others, or the security of the institution or as a result of

a classification action. Restrictive housing inmates receive the following services and programs unless documented security and safety considerations dictate otherwise":

1. Prescribed medication and access to health care by a qualified health care official.

2. Clothing that is not degrading.

3. Access to authorized personal items for use in their cells.

4. Substantially the same meals served to the general population.

5. The opportunity to shave and shower at least three times per week.

6. The issue and exchange of clothing, bedding and linen on the same basis as inmates in the general inmate population.

7. Access to laundry services on the same basis as inmates in the general inmate population.

8. Access to hair care services on substantially the same basis as inmates in the general inmate population.

9. The same opportunity to write and receive letters as is available to the general inmate population.

10. Opportunities to visit.

11. Telephone privileges as defined in A.R. 205.03, *Inmate Telephone Regulations*.

12. Access to legal\reading materials.

13. A minimum of one hour per day, five days per week, of exercise outside their cells.

(Filing No. 65-2 at CM/ECF pp. 16-17, Section XI.A.)

17.     Inmates housed in restrictive housing are permitted to possess property and will be provided earbuds (one per inmate), a television (one per cell and subject to Behavioral/Programming Plan compliance once assigned to LTRH), and hygiene and stationary materials. (Filing No. 65-2 at CM/ECF pp. 17-18, Section XI.D.)

18.     Once assigned to LTRH, "inmates may be permitted to possess additional personal property items based on compliance with behavior and/or treatment plans. Plans shall specifically identify incentives that will be provided for complying with the expectations of the plan. Incentives may include, but are not limited to, the following:"

    a.    Additional cell cleanings

    b.    Job assignment consideration

    c.    Extra shower (4 total)

    d.    Extra yard sessions (6 total)

    e.    Extra personal phone calls

    f.    Extra visit (2 total per week)

    g.    Additional canteen (Up to $20, excluding legal materials)

    h.    Authorized congregate activities

    i.    Kiosk access

    j.    Personal MP4 player

      (1)    MP4 messaging
      (2)    Kiosk access to purchase music

(Filing No. 65-2 at CM/ECF pp. 18-19, Section XI.D.3.)

**NDCS LTRH Classification Procedures**

19.    All assignments to LTRH require a classification hearing. For restrictive housing actions, the Unit Classification Committees ("UCC") shall include, but not be limited to, a unit manager, case manager, and unit sergeant. The LTRH classification action includes a review of the following: the LTRH Referral Form, the most recent custody classification action form, the most recent STRONG-R scores, the inmate's Behavior/Programming Plan, Inmate Contact Notes to include all entries during the current restrictive housing placement, and, if applicable, a Confidential Intelligence Memo and a Restrictive Housing Individual Treatment Plan. (Filing No. 65-2 at CM/ECF pp. 8-9, Section IV.B.)

20.    Unit Staff must give the inmate the Notice/Waiver of Classification Hearing at least 48 hours in advance of the hearing. The notice shall include the following: the date, time and place of the classification hearing; the reason LTRH status is being considered, to include copies of the LTRH Referral form, the inmate's Behavior/Programming Plan and, if applicable, the inmate's Individual Treatment Plan; an advisement that the inmate may present a written appeal of the recommendation action at the time of his/her classification hearing to be considered by the Warden and the Central Office Multi-Disciplinary Review Team ("MDRT") in the review of his/her status. (Filing No. 65-2 at CM/ECF p. 9, Section IV.B.1.)[8]

_____

[8] Before July 2016, there was no LTRH Referral form; instead, when an inmate's restrictive housing placement, continuation, or removal was being considered, Unit Staff was required to give the inmate a Reclassification Narrative Form that provided "sufficient information to enable the inmate to prepare a response." (Filing No. 65-3 at CM/ECF p. 7, Section VII.A. 2.)

## Unit Classification Committee ("UCC")

21.     Review of an inmate's restrictive housing status shall occur regularly. The UCC must conduct formal reviews of the status of each Restrictive Housing inmate every seven days until sixty days after the inmate has been placed in restrictive housing. The UCC must conduct formal reviews of the status of each restrictive housing inmate every two weeks after sixty continuous days of restrictive housing. (Filing No. 65-2 at CM/ECF p. 15, Section IX.A-B.)

22.     The UCC may recommend that the inmate be removed from Immediate Segregation status or assigned to or continued on LTRH status. The inmate shall have the opportunity to refute the information presented, submit a written appeal of the recommendation and/or any other pertinent information. (Filing No. 65-2 at CM/ECF p. 9, Section IV.B.2.)

23.     After the hearing, the inmate may be asked to leave the hearing room while the UCC deliberates. At the conclusion of the hearing, the inmate will be advised of the UCC's recommendation. The UCC must then forward all documents reviewed at the hearing to the Institutional Classification Committee/Warden. (Filing No. 65-2 at CM/ECF p. 10, Section IV.B.2.h-j.)

## Institutional Classification Committee ("ICC") & Warden Review

24.     The ICC and the Warden shall review the UCC's recommendation. The Warden will make a recommendation to the Central Office Multi-Disciplinary Review Team, who will make the final decision. (Filing No. 65-2 at CM/ECF p. 10, Section IV.B.3.)

## Central Office Multi-Disciplinary Review Team ("MDRT")

25.     The Central Office MDRT is a team comprised of the Deputy Director of Operations (Chair), the Behavioral Health Administrator, the Intelligence Team

Leader, a representative from the classification unit and a representative of the research division. Others may be added at the discretion of the Chair or the Director. Any delegation of representation on the MDRT must be approved, in advance, by the Chair. The MDRT shall meet weekly. (Filing No. 65-2 at CM/ECF p. 2.)

26.    Inmates in LTRH shall have classification hearings at least every ninety days to assess demonstrated compliance with individualized transition and treatment plans and assess the potential for promotion to a less restrictive setting based on compatibility with the safety of the inmate, others, and security of the facility. (Filing No. 65-2 at CM/ECF p. 11, Section IV.4.b.)

27.    The MDRT conducts a review of each restrictive housing placement and makes an independent determination of whether the individual continues to pose a risk that requires placement in restrictive housing and whether a less restrictive housing placement can effectively mitigate the risk. (Filing No. 65-8 at CM/ECF p. 5.)

28.    The MDRT shall document the decision and rationale for promotion to a less restrictive environment or to continue the inmate in LTRH at each review. (Filing No. 65-2 at CM/ECF p. 11, Section IV.B.4.c.)

29.    When an inmate has been assigned to restrictive housing for 365 days, the NDCS Director must approve continued assignment to LTRH status. (Filing No. 65-2 at CM/ECF p. 12, Section IV.B.6.)

**Plaintiff Dylan Landers**

30.    Plaintiff is an inmate in the custody and control of the NDCS and is currently housed at NSP. Plaintiff is currently serving a sentence of 20 to 40 years with a projected release date of April 27, 2030. (Filing No. 65-1 at CM/ECF p. 2, ¶ 4.)

31.     Beginning at approximately 2:30 p.m. on May 10, 2015, and unfolding over the following several hours, a significant inmate disturbance occurred at Tecumseh State Correctional Institute ("TSCI"). This disturbance affected virtually every aspect of operations at TSCI and included inmate violence in multiple locations and housing units, widespread inmate refusal to follow staff orders to lock down, the temporary forceful assumption of control of certain areas of the facility by inmates, physical threats to the safety of inmates and staff, actual assaults upon staff, and, ultimately, the deaths of two inmates. (Filing No. 65-1 at CM/ECF p. 2, ¶ 6.)

32.     On May 17, 2015, Plaintiff, while housed at TSCI, was placed in Immediate Segregation pending an investigation regarding a criminal act and for the safety and security of the institution. (Filing No. 65-1 at CM/ECF p. 2, ¶ 7; Filing No. 65-6 at CM/ECF pp. 1-3 (Plaintiff's Classification File); *see also* Filing No. 65-3 at CM/ECF p. 3, Section III.B.)

33.     In June 2015, Plaintiff was placed in what was termed by NDCS as "Administrative Confinement" as he was the subject of an ongoing investigation regarding the May 10, 2015 disturbance at TSCI. (Filing No. 65-1 at CM/ECF p. 2, ¶ 8; Filing No. 65-6 at CM/ECF pp. 10-22.)

34.     Plaintiff remained in Administrative Confinement until February 2016, when he was reclassified to General Population/"SMU [Special Management Unit] West." (Filing No. 65-6 at CM/ECF pp. 23-81.)

35.     On April 18, 2016, Plaintiff was placed back in Immediate Segregation because of a pending classification hearing and for "the safety and security of the institution." (Filing No. 65-6 at CM/ECF p. 86; *see also* Filing No. 65-3 at CM/ECF p. 3, Section III.B.)

36.     A subsequent classification action placed Plaintiff in Administrative Confinement. (Filing No. 65-6 at CM/ECF pp. 96-104.)

37.     Plaintiff remained in Administrative Confinement or LTRH (after July 2016) until February 2017 based on a pending external investigation[9] due to Plaintiff's participation in the May 10, 2015 disturbance at TSCI.  (Filing No. 65-6 at CM/ECF pp. 96-195.)

38.     In February 2017, Plaintiff was reclassified, removed from restrictive housing status, and placed in General Population upon his transfer to NSP. (Filing No. 65-1 at CM/ECF p. 4, ¶ 15; Filing No. 65-6 at CM/ECF pp. 195-98.)

39.     In March 2017, however, the NDCS received reliable information that warranted Plaintiff's placement back in restrictive housing on Immediate Segregation status pending an investigation of a "[s]erious act of violent behavior." (Filing No. 65-1 at CM/ECF p. 4, ¶ 16; Filing No. 65-6 at CM/ECF p. 199; *see also* Filing No. 65-2 at CM/ECF pp. 5-6, Section III.B.)

40.     After an investigation, Plaintiff, in April 2017, was placed back in LTRH. Facility staff had specific and reliable information that Plaintiff was an active member in the "Peckerwoods" Security Threat Group and had engaged in dangerous and threating behavior. Plaintiff was determined to be high risk based on his Security Threat Group membership as it presented a threat to staff and other inmates. Intensive supervision was determined to be warranted. (Filing No. 28 at CM/ECF p. 28; Filing No. 65-1 at CM/ECF p. 5, ¶ 20; Filing No. 65-6 at CM/ECF p. 208.)

41.     Plaintiff currently remains in LTRH as facility staff have specific and reliable information that he continues to be an active member in the "Peckerwoods" and has engaged in dangerous and threatening behavior, including directing STG assaults and/or violence. Given his past behavior, the MDRT has determined that restrictive housing placement is necessary to mitigate the risk of his committing future serious assaults. (Filing No. 65-1 at CM/ECF p. 5, ¶ 20.)

---

[9] The external investigation was being conducted by the Nebraska State Patrol (Filing No. 65-6 at CM/ECF p. 184.)

42.     While Plaintiff was in Administrative Confinement/LTRH he had access to the yard, showers, and medical. (Filing No. 65-1 at CM/ECF p. 4, ¶ 14; *see generally* Filing No. 65-6.)

43.     Plaintiff's restrictive housing status has also been reviewed and monitored regularly by the UCC (also commonly referred to as the Segregation Status Review Committee), the ICC, and the Warden. (*See, e.g.*, Filing No. 65-1 at CM/ECF p. 4, ¶ 14; *see generally* Filing No. 65-6.)

44.     While in LTRH, Plaintiff has also had Behavior and Programming Plans that include goals, recommendations, and incentives. (*See, e.g.*, Filing No. 65-6 at CM/ECF pp. 220-95.)

45.     Plaintiff has received several incentives while in LTRH, including: extra phone calls, additional yard time, additional showers, cell cleaning materials, canteen items, books and magazines, personal earbuds, and visitations. (*See, e.g.*, Filing No. 65-6 at CM/ECF p. 294.)

46.     Defendant Sabatka-Rine has served as Chair of the Central Office MDRT. In addition to Sabatka-Rine, the MDRT was composed of the Behavioral Health Administrator, the Intelligence Team Leader, a representative from the classification unit, and a representative of the research division. Others may be added at the discretion of the Chair or the Director. The MDRT meets weekly. (Filing No. 65-1 at CM/ECF p. 5, ¶ 19.)

47.     The MDRT, at times when Plaintiff was in LTRH, was composed of the Defendants in the instant case, including Sabatka-Rine, Beaty, Bryant, Connolly, and Rothwell. (Filing No. 65-1 at CM/ECF p. 5, ¶ 19; *see also* Filing No. 34 at CM/ECF p. 2, ¶ 3; *see generally* Filing No. 65-6.)

48. When Plaintiff's time in LTRH exceeded 365 days, reviews were also done by Defendant Frakes, NDCS Director. (*See generally* Filing No. 65-6.)

# III. ANALYSIS

## A. Standard of Review

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 949 (8th Cir. 2012). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A party opposing summary judgment "may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial, and must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 256-57 (quotations omitted); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-60 (1970).

**B. Qualified Immunity**

Defendants argue that they are entitled to summary judgment because they are immune from suit in their individual capacities under the doctrine of qualified immunity. "Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Stated another way, qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information that the defendant possessed." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (internal quotation and citation omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.*

Qualified immunity requires a two-part inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). If no reasonable fact-finder could answer yes to both of these questions, the official is entitled to qualified immunity. *Id.* "Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009).

Accordingly, in reviewing this Motion, the court will first examine whether the facts as alleged by Plaintiff reasonably show that the individually-named Defendants have violated Plaintiff's constitutional rights. If the facts do not show a violation, the court need not proceed further with the qualified immunity analysis.

**C. Due Process Claims**

Plaintiff claims that his prolonged segregation constitutes an "atypical and significant" hardship and that Defendants' failure to provide him with meaningful reviews of his segregated status violates his rights under the Due Process Clause. The court concludes that Plaintiff's claim fails because he has not presented evidence that he was denied due process.

In general, an inmate has no liberty interest in avoiding segregation, as long as the conditions do not amount to an "atypical and significant" hardship that would give rise to due process protection as set forth in *Sandin v. Conner*, 515 U.S. 472, 483-484 (1995). The factors bearing on whether placement in segregation imposes the kind of atypical and significant hardship which gives rise to a liberty interest are objective, i.e.: (1) the conditions of confinement in segregation; (2) the length of time spent in segregation; and (3) the effect, if any, on the duration of the prisoner's incarceration. *Id.* at 486–87. The Eighth Circuit has consistently held that "administrative and disciplinary segregation are not atypical and significant hardships[.]" *Portley-El v. Brill*, 288 F.3d 1063, 1065 (8th Cir. 2002); *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship.").

However, the Eighth Circuit has recognized that there may be limits to this general rule, and, under certain circumstances, prolonged confinement in administrative segregation can rise to the level of an atypical and significant hardship. *See Williams v. Norris*, 277 F. App'x 647, 648 (8th Cir. 2008) (unpublished per curiam decision) (holding that an inmate's 12 years in administrative segregation confinement constituted an atypical and significant hardship); *Herron v. Schriro*, 11 F. App'x 659, 661–62 (8th Cir. 2001) (unpublished per curiam decision) (affirming district court's finding that inmate's lengthy administrative segregation confinement, more than 13 years, resulted in atypical hardship in relation to ordinary incidents of prison life, and defendants could not

continue to deprive inmate of general population status without affording him due process).

At the time Plaintiff filed his Complaint, he had been in restrictive housing for a total of over two and a half years. Defendants "do not contest that [Plaintiff] has been in restrictive housing for a prolonged period of time" but contend that Plaintiff's "classification and confinement status comport with the standards set forth in *Sandin* and that [Plaintiff] has not been imposed hardships that are atypical or significant. ([Filing No. 64 at CM/ECF p. 17](#).) Assuming, without deciding, that Plaintiff has a liberty interest in avoiding segregation of the length of time he describes,[10] he is therefore entitled to some due process in considering whether he should remain segregated. *See Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (once a liberty interest is established, the next question is what process is due); *Williams*, 277 F. App'x at 649 (same).

The Due Process Clause requires periodic review of an inmate's placement in administrative segregation at regular intervals and annual meetings with a warden. *See Williams*, 277 F. App'x at 649 ("We conclude that, for an ad seg inmate, the Constitution requires no more than the process Williams received—reviews at 60–day intervals at which Williams could make statements and present evidence, and annual meetings with a warden—provided such reviews were meaningful.");

_____

[10] *See, e.g., Iqbal v. Hasty*, 490 F.3d 143, 161 (2d Cir. 2007), *rev'd on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (cited with approval by *Williams*, 277 F. App'x at 648-49, finding that segregation of longer than 305 days in standard "special housing unit" conditions was sufficiently atypical to require procedural due process protection under *Sandin*;); *King v. Lombardi*, No. 4:17CV742 CAS, 2017 WL 2277190 (E.D. Mo. May 25, 2017) (continued segregation for 923 days implicates a liberty interest and stated a due process claim); *Thomas v. Thompson*, No. 4:13CV622 AGF, 2015 WL 222165, at *4-5 (E.D. Mo. Jan. 14, 2015) ("The Court believes that the Eighth Circuit would find that Plaintiff's 19 months in administrative segregation at SECC triggered due process protections."); *Morgan v. Wallace*, No. 1:13CV13 SNLJ, 2014 WL 3557643, at *6 (E.D. Mo. July 18, 2014) (assuming that the plaintiff who was in administrative segregation for a little more than a year at SECC was entitled to due process).

*Rahman X v. Morgan*, 300 F.3d 970, 973-74 (8th Cir. 2002) (discussing sufficiency of process for ADC inmate in segregation cell); *Jones v. Mabry*, 723 F.2d 590, 594 (8th Cir. 1983) (due process requires procedure for periodic review of ad seg status); *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975) (where inmate is held in ad seg for prolonged or indefinite period, due process requires that his situation be reviewed periodically in meaningful way).

In addition, these reviews must be "meaningful," and must ensure that the prison is not using administrative segregation as a pretext for indefinite confinement. *See Williams*, 277 F. App'x at 649; *Rahman X*, 300 F.3d at 974; *Jones*, 723 F.2d at 594; *Kelly*, 525 F.2d at 400. The Eighth Circuit has noted that a meaningful review is one that does not "make it virtually impossible for an inmate . . . ever to persuade the Warden that he should be returned to population," must not fail to give the inmate a reason for his continued confinement, and must apprise the inmate of any new reasons to continue his confinement to segregation. *Williams v. Hobbs*, 662 F.3d 994, 1007-09 (8th Cir. 2011) (quoting *Kelly*, 525 F.2d at 401-02).

Here, Plaintiff claims that he is being denied due process because he has not received meaningful—but rather "sham"—reviews of his restrictive housing assignment. The undisputed evidence indicates otherwise.

As part of the classification process, Plaintiff was given notices/waivers of the classification hearings, which included copies of the reclassification narrative forms and, if applicable, the LTRH referrals and Plaintiff's Behavior/Programming Plan. (*See generally* Filing No. 65-6.) On almost all the notices/waivers, Plaintiff initialized that he had received copies of these forms. (*See generally* Filing No. 65-6.) The narrative forms and LTRH referrals informed Plaintiff of the reason that Administrative Confinement or LTRH status was being considered or continued. (*See generally* Filing No. 65-6.) For example, Plaintiff was advised that his placement/continuation in Administrative Confinement or LTRH at TSCI was based on pending investigations into Plaintiff's participation in the May 10, 2015 disturbance at TSCI, during which two inmates were murdered. (*See generally* Filing

No. 65-6.) Likewise, Plaintiff was advised that his placement/continuation in LTRH at NSP was based on his active membership in the Peckerwoods STG and his dangerous or threatening behavior, including STG assaults or violence.[11] (*See generally* Filing No. 65-6.)

It is also undisputed that Plaintiff received periodic and annual reviews of his placement in restrictive housing by the UCC/Segregation Status Review Committee, the ICC, and the Warden. (Filing No. 65-1 at CM/ECF p. 4, ¶ 14; *see generally* Filing No. 65-6.) Plaintiff does not allege or provide any evidence that he was prevented from attending the restrictive housing hearings/reviews or was denied opportunities to make a statement or be heard. To the contrary, Plaintiff admits that he "attended his reviews and would inquire about [his] placement." (Filing No. 75 at CM/ECF p. 5, ¶ 10.) A review of Plaintiff's classification file confirms this. (*See generally* Filing No. 65-6.) On numerous occasions, however, Plaintiff waived his presence at the hearings/reviews or refused to participate in them. (*See generally* Filing No. 65-6.)

The undisputed evidence further establishes that the MDRT reviewed Plaintiff's restrictive housing placement at least every ninety days to assess compliance with behavioral and programming plans and to determine if promotion to a less restrictive setting was compatible with the safety of the inmate, others, and security of the facility. (*See generally* Filing No. 65-6.) And, after 365 days in

---

[11] To the extent Plaintiff argues that due process requires Defendants to provide him with a detailed description and the documents containing confidential and sensitive information explaining their reasoning for placing him in administrative confinement, the court disagrees. The law simply does not require prisons to provide such detailed reporting to its prisoners. *See Allen v. McDaniel*, No. 3:08-CV-00430-RCJ, 2010 WL 3810065, at *4-5 (D. Nev. Aug. 31, 2010), *report and recommendation adopted*, No. 3:08-CV-00430-RCJ, 2010 WL 3782068 (D. Nev. Sept. 22, 2010). In addition, NDCS regulations state that the "identity of any confidential informants . . . will not be disclosed to the inmate" at classification hearings. (Filing No. 65-2 at CM/ECF p. 10, Section IV.B.2.g.)

restrictive housing, the Director reviewed Plaintiff's placement in restrictive housing. (*See generally* Filing No. 65-6.)

Defendants' decisions and rationale regarding restrictive housing placement have been documented and provided to Plaintiff. Plaintiff's disagreement with these decisions does not establish that he was deprived of due process. Indeed, the Eighth Circuit has held that an inmate "does not have a constitutional right to a particular prison job or classification." *Sanders v. Norris*, 153 F. App'x 403, 404 (8th Cir. 2005); *Hartsfield v. Dep't of Corr.*, 107 F. App'x 695, 696 (8th Cir. 2004) (unpublished per curiam decision) (stating that inmate has "no liberty interest in a particular classification"). Nor does the fact that the MDRT continued Plaintiff's LTRH placement over recommendations for his removal by case managers and/or the UCC demonstrate that the classification reviews are "shams." Rather, the record indicates that case managers and the UCC recommend Plaintiff's removal and placement in General Population because he had completed certain programs and because he needed to take "Anger management with review" in General Population for his parole hearing in April 2020. (Filing No. 28 at CM/ECF p. 21; *see generally* Filing No. 65-6.) The MDRT, however, determined that Plaintiff remained "high risk" based on his active membership in the Peckerwoods STG and on specific and reliable confidential information that he had engaged in or directed dangerous or threatening behavior of others, including STG assaults or violence. (*See generally* Filing No. 65-6.) In addition, Frakes noted that "'Anger Management with Review' was no longer offered" and that the "[r]ecommendation need[ed] to be updated." (Filing No. 65-6 at CM/ECF p. 283.) This evidence does not show that the MDRT ignored the recommendations and simply "rubber stamped" Plaintiff's LTRH continuation. Rather, it is evident the MDRT's decision was based on safety and security considerations related to Plaintiff's behavior and STG involvement. Furthermore, the record does not demonstrate that the review process has made it virtually impossible for Plaintiff to return to General Population—on two occasions he was reclassified to General Population. That he was ultimately returned to Administrative Confinement or LTRH does not show lack of a meaningful review process.

In light of the evidence detailed above, the court finds that no reasonable fact finder could find that the facts alleged or shown, construed in the light most favorable to Plaintiff, establish a due process violation. *See Rahman X*, 300 F.3d at 974 (state prisoner was given process sufficient to comport with due process clause when he was placed in segregation cell, rather than death-row cell, after being convicted of killing guard, even though he claimed he received no written notice of hearing to change his housing placement, where he had requested hearing and thus had notice it might be forthcoming at some unspecified point in future, he was allowed to make statement and be heard, prison committee reconsidered his assignment every sixty days, and he was given opportunity to address committee at each hearing).

### D. Eighth Amendment

Plaintiff claims that, while in segregation, he has not been allowed to shower, use the telephone, or have any visitation. (Filing No. 1.) He also alleges that he is confined for all but five hours per week in a "very small cell" that has no mirror, chair/stool, or table. (Filing No. 28 at CM/ECF p. 2.) Additionally, Plaintiff claims he is

> deprived of most of his personal property as well as the ability to work, attend educational and vocational programs, associate with other prisoners and learn good social-communication skills, attend outdoor recreation in a congregate setting with the ability to engage in sports and other congregate recreational activities, attend meals with other humans, attend religious services. . . .

(*Id.*) Defendants argue that the facts alleged or shown do not establish a conditions-of-confinement claim under the Eighth Amendment. The court agrees.

Under an Eighth Amendment analysis, administrative segregation "is not necessarily unconstitutional, but it may be, depending on the duration of the confinement and the conditions thereof." *Hutto v. Finney*, 437 U.S. 678, 685-86

(1978) (internal quotations omitted). To establish that a prisoner's conditions of confinement violate the Eighth Amendment, the prisoner must show that (1) the alleged deprivation is, "objectively, sufficiently serious," resulting "in the denial of the minimal civilized measure of life's necessities," and (2) that the prison officials were deliberately indifferent to "an excessive risk to inmate health or safety," meaning that the officials actually knew of and disregarded the risk." *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994)). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Here, Plaintiff has failed to provide any evidence even approaching this exacting standard. There is no evidence that Plaintiff has been denied of any of the civilized measure of life's necessities. He has not been deprived of clothing, food, shelter, bedding, or bathroom facilities, and he has had access to the yard, showers, and medical. (Filing No. 1 at CM/ECF p. 4, ¶ 14; *see generally* Filing No. 65-6.)

Any restrictions placed on Plaintiff's use of the shower and telephone, on his access to a table or chair in his cell, or on his visitation, recreational, and other congregate privileges, do not amount to such a serious deprivation so as to warrant Plaintiff relief under the Eighth Amendment. The court recognizes that the conditions in restrictive housing may cause Plaintiff discomfort, but such evidence does not indicate that these conditions pose an excessive risk to his health or safety. *See, e.g.*, *Rahman*, 300 F.3d at 973-74 (finding that 26 months in segregation and the deprivation of other privileges was not "sufficiently serious" to establish an Eighth Amendment violation). Far worse conditions than those experienced by Plaintiff have been held not to violate the Eighth Amendment. *See, e.g.*, *Key v. McKinney*, 176 F.3d 1083, 1086 (8th Cir. 1999) (the inmate was in handcuffs and leg shackles for twenty-four hours and although the shackles made it more difficult to sleep and relieve himself, he did not show that he suffered a serious deprivation of "the minimal civilized measure of life's necessities"); *O'Leary v. Iowa State*

*Men's Reformatory*, 79 F.3d 82, 83-84 (8th Cir. 1996) (per curiam) (several days without underwear, blankets, mattress, exercise or visits not in violation of Eighth Amendment); *Seltzer-Bey v. Delo*, 66 F.3d 961, 963 (8th Cir. 1995) (inmate placed in "strip cell for two days without clothing, bedding, or running water, with a concrete floor, a concrete slab for a bed, and cold air blowing on him"); *Williams*, 49 F.3d at 444 (prisoner placed in segregation cell without clothes, running water, hygiene supplies, mattress, and legal mail for a period of four days was not deprived of the minimal civilized measure of life's necessities).

To the extent that Plaintiff challenges the deprivation of his personal property (filing no. 28 at CM/ECF p. 2) as an Eighth Amendment violation, the argument fails. "One's right to possess personal property is severely diminished upon imprisonment," and there is "no constitutional right prohibiting prison officials from confiscating most of a prisoner's personal property pending release from prison," so long as it complies with due process. *Secret v. Brierton*, 584 F.2d 823, 830 (7th Cir. 1978); *accord Haggins v. Minnesota D.O.C. Comm'r*, No. CIV. 10-4427 DWF/LIB, 2012 WL 983593, at *14 (D. Minn. Jan. 20, 2012), *report and recommendation adopted*, No. CIV. 10-4427 DWF/LIB, 2012 WL 983694 (D. Minn. Mar. 22, 2012). The confiscation of any of Plaintiff's personal items in accordance with the prison's policy does not constitute an infliction of pain under the Eighth Amendment. *See Hosna v. Groose*, 80 F.3d 298, 305 (8th Cir. 1996) ("We find nothing unreasonable nor exaggerated in limiting the type of personal property in administrative segregation cells."). Plaintiff has produced no evidence that his personal property was confiscated in violation of prison policies.

In addition, the Eighth Circuit has held that mere deprivation of access to religious services does not violate the Eighth Amendment because it does not "inflict unnecessary or wanton inflictions of pain, nor [does it] involve 'life's necessities,' such as water, food, or shelter." *Phillips*, 320 F.3d at 848 (thirty-seven day isolation without contact visitation or religious services did not violate Eighth Amendment).

Nor has Plaintiff shown that any denial of recreation was a sufficiently serious deprivation of his exercise needs. *See McCrary v. Delo*, 45 F.3d 433 (8th Cir. 1994) (thirty-day denial of recreation was not a sufficiently serious deprivation of inmate's exercise needs) ; *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (out-of-cell recreation time of forty-five minutes per week did not violate Eighth Amendment rights of an inmate assigned to protective custody unit for his own safety; restriction did not cause the inmate to suffer any injury or decline in health, he had not used all recreation time available to him, and he had the opportunity to exercise within his cell); *Knight v. Armontrout*, 878 F.2d 1043 (8th Cir. 1989) (depriving convicted prisoners in administrative segregation of recreational activity for thirteen days was not cruel and unusual punishment proscribed by the Eighth Amendment). Indeed, Plaintiff only seems to allege that he was deprived of *group* recreational and sport activities, not a total or near-total deprivation of exercise or recreational opportunities.

In sum, Plaintiff's Eighth Amendment claim fails because he has not presented evidence that he was denied access to life's necessities or that any of the Defendants knew of and disregarded a substantial risk of serious harm to him. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's Eighth Amendment claim is granted.

## E. State Law Claims

When a district court dismisses federal claims over which it has original jurisdiction, the balance of interests usually "will point toward declining to exercise jurisdiction over the remaining state law claims." *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 792 (8th Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). *See also Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006) ("Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c) to dismiss supplemental state law claims when all federal claims have been dismissed . . . ."). Indeed, the Court of Appeals has "stress[ed] the need to exercise judicial restraint and avoid state law issues wherever possible." *Gregoire v. Class*,

236 F.3d 413, 420 (8th Cir. 2000) (quoting *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990)). "[W]hen state and federal claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law. . . ." *Id.* at 419-20 (quoting *ACLU v. City of Florissant*, 186 F.3d 1095, 1098-99 (8th Cir. 1999)).

Because the court is dismissing Plaintiff's federal claims, the court declines to rule on Defendants' Motion for Summary Judgment regarding Plaintiff's state-law claims. Therefore, the court will dismiss Plaintiff's state law claims without prejudice to reassertion in the proper forum. *See Labickas v. Arkansas State Univ.*, 78 F.3d 333, 334-35 (8th Cir. 1996) (per curiam) (while district court had discretion to dismiss state law claims, such claims should have been dismissed without prejudice).

IT IS THEREFORE ORDERED that:

1.      Plaintiff's Motion to Include Evidence (filing no. 81) is denied.

2.      Defendants' Motion for Summary Judgment (filing no. 63) is granted in part and denied in part, as follows:

> a.   The Motion is granted with respect to Plaintiff's Due Process and Eighth Amendment claims, and such claims are dismissed with prejudice.

> b.   The Motion is denied with respect to Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c)(3), and such claims are dismissed without prejudice.

3.    A separate judgment will be entered.

Dated this 8th day of April, 2019.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge